IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DONALD L. LENNOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIV-15-73-HE |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying his application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded to the agency for further administrative proceedings.

I. Background

Plaintiff filed his application for benefits on June 9, 2010. (TR 21). The application itself does not appear in the record. However, it appears from agency notations that Plaintiff alleged disability due to a learning disability, back pain, a skin rash, and depression. (TR 112,

1

122). Plaintiff was given four extensions of time for his administrative hearing based on his statements that he had been unable to obtain representation or was in the process of obtaining representation. (TR 37-63, 128, 151, 176, 195).

On July 11, 2013, Plaintiff appeared with counsel at an administrative hearing conducted by Administrative Law Judge Shepherd ("ALJ"). (TR 64-108). At this hearing, Plaintiff testified and his friend with whom he resided also testified. A vocational expert ("VE") provided testimony as well.

Plaintiff did not submit any medical evidence to the agency. A consultative psychological evaluation of Plaintiff was conducted for the agency by Dr. Poyner on July 29, 2010. Dr. Poyner provided a report and an amended report concerning this evaluation. In the amended report, Dr. Poyner stated, as general observations, that Plaintiff's

> grooming and hygiene at the time of the evaluation were adequate and there were no signs of self-neglect. He exhibited no problems with ambulation or other physical/medical issues. His behavior was generally appropriate and he showed no signs of having a serious or pervasive mental illness. However, based on his presentation, it is believed that he is an alcoholic. His communication skills, as evidence by his slurred and repetitive speech, support that conclusion.

(TR 378). According to Dr. Poyner's amended report, Plaintiff stated he had not received any mental health treatment but he was a "slow learner." (TR 378). He had previously been prescribed medication for depression during an incarceration, but he denied any suicidal thoughts or previous attempts. He stated he completed the ninth grade in special education classes. He stated he was unemployed and could not work because his comprehension was too slow. He reported numerous incarcerations and a history of being homeless and using

2

alcohol regularly with his last use "about a week ago." (TR 378). He was living with a friend at that time.

In intellectual testing, Dr. Poyner reported that Plaintiff exhibited a full scale IQ of 63. Dr. Poyner opined that Plaintiff had "significant cognitive/intellectual and adaptive impairment[s] of such severity as to interfere with his daily living, family, recreational, and social functioning. He would require a payee if he were awarded benefits." (TR 379). Dr. Poyner's Axis I diagnoses were alcohol dependence and adjustment disorder with disturbance of conduct. The Axis II diagnosis was mental retardation. The Axis V rating was 59. (TR 379).

Plaintiff's friend, Ms. Smith, testified at the hearing that she took Plaintiff into her home to live because she had known him for a long time and he was homeless. (TR 94). She also thought it would be good for her disabled brother, for whom she also provided a home, to have Plaintiff there. She testified that Plaintiff helped her brother by "giving him something to eat, emptying his container, and helping him to the bathroom." (TR 95). Her brother "mostly tell[s] Donald what he want[s] him to do. I don't think Donald is capable of following orders from anyone else" because he is "very slow, sir, very slow." (TR 95). She stated that if Plaintiff is told to do something over because "it's not right," he has "to be guided" and "it takes him a long time to mow the yard. . . . [and] then it has to be redone." (TR 96).

When asked about Plaintiff's ability to concentrate, Ms. Smith stated he "just sits out in the yard and he just stare[s] into another world if my brother's not talking to him. He

3

don't concentrate that much, sir at all." (TR 98). She stated that he would remember an instruction for only two to three minutes, that he had to be told repetitively to perform a task, and she and her brother had to "guide him" and supervise him throughout the day. (TR 99). She described an incident in which she helped Plaintiff obtain a job with her landlord in construction but Plaintiff was terminated after one day because he was "too slow, he can't comprehend." (TR 101).

II. ALJ's Decision

In a decision entered August 20, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. Following the agency's well-established sequential evaluation procedure, the ALJ found at step one that Plaintiff had not worked since his application date of June 9, 2010. (TR 23). At step two, the ALJ found that Plaintiff had a severe impairment due to mental retardation. The agency no longer uses this term, and it is assumed that the ALJ was referring to the impairment of intellectual disability. 20 C.F.R. pt. 404, subpt. P, § 12.05.

Considering the requirements of the listed impairment for intellectual disability, Listing 12.05, the ALJ found that Plaintiff's impairment did not satisfy or medically equal the requirements of the listing. The ALJ found that Plaintiff had no past relevant work, and did not address the fourth step. Proceeding to the fifth and final step, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at all exertional levels but was limited by nonexertional impairments. The ALJ found that Plaintiff would be able to "understand, remember, and carry out simple, routine, and repetitive tasks. [He] can

respond appropriately to supervisors, coworkers, and usual work situations, but have no contact with the general public. The claimant cannot perform assembly-line work." (TR 25). Relying on the VE's hearing testimony, the ALJ found that Plaintiff could perform jobs available in the economy, such as ground maintenance worker, janitor, and dishwasher. Based on these findings, the ALJ denied Plaintiff's application. The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. § 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

III. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq*. A disability is an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

IV. Step Three Finding

Plaintiff contends that the ALJ's step three finding is not supported by substantial evidence in the record and that Plaintiff should have been found presumptively disabled under Listing 12.05(C).[1]

---

[1] Listing 12.05 provides: "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
B. A valid verbal, performance, or full scale IQ of 59 or less; OR
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Dr. Poyner's Axis I[2] diagnoses included alcohol dependence, which is described by the agency as a substance addiction disorder and adjustment disorder with disturbance of conduct. (TR 374). Dr. Poyner's Axis II diagnosis was mental retardation (or intellectual disability, employing the agency's term for this impairment). (TR 374). Nowhere in the ALJ's decision did he recognize Dr. Poyner's multiple diagnoses or discuss why he implicitly rejected all but one of those diagnoses.[3] The ALJ's failure to acknowledge and evaluate Plaintiff's substance addiction disorder (see Listing 12.09) and adjustment disorder at steps two and three was error.

As to the one diagnosis that the ALJ found constituted a severe impairment, the ALJ's findings are without support in the record. The agency's listing for an intellectual disability impairment is unlike other mental impairment listings. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A). "Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the agency] will find that

---

[2] In the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV), Axis I covered clinical disorders including schizophrenia and other psychotic disorders, mood disorders, anxiety disorders, and substance-related disorders, and Axis II covered personality and intellectual disability disorders. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 27–28 (4th ed. 2000). The American Psychiatric Association has since eliminated its use of the multiaxial system for classifying mental disorders, but the DSM–IV was effective during the relevant period here.

[3] If the ALJ simply did not consider Dr. Poyner's Axis I diagnoses to be valid psychological diagnoses, he would be mistaken. See http://www.samhsa.gov/disorders/substance-use; https://www.nlm.nih.gov/medlineplus/ency/article/000932.htm.

7

[the] impairment meets the listing." Id.

The ALJ did not specifically address whether or not Plaintiff's mental impairment satisfied the capsule portion of the Listing. However, it can be assumed that the ALJ found the capsule portion was satisfied as the ALJ found that Plaintiff's mental impairment did not satisfy the requirements of parts A, B, C, or D.

Plaintiff does not dispute the ALJ's findings with respect to parts A, B, or D. Plaintiff contends that the medical evidence showed his mental impairment satisfied the requirements of part C of Listing 12.05. For part C of this listing, the regulations provide that the agency "will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits [the claimant's physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).

With respect to this portion of the listing, the ALJ found "[i]n terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (TR 23). This conclusory finding is simply not supported by the evidence in the record, which includes Dr. Poyner's multiple diagnoses of mental disorders.

Additionally, with respect to Part D of the relevant listing, the ALJ found that Plaintiff had only moderate or mild functional limitations, despite the fact that he was residing with a friend, Ms. Smith, and before that he had been homeless for an extended period of time.

8

(TR 77). Ms. Smith testified that he needed constant supervision and direction and that he was unable to concentrate or perform even minor household chores at an adequate level. With direction, he could assist Ms. Smith's disabled brother in simple tasks, such as assisting him to go to the bathroom, making a sandwich, or emptying a tea cup, but he had no friends and spent his spare time mostly "walk[ing] around" the small town where Ms. Smith lived or sitting under a tree in Ms. Smith's backyard. (TR 95, 98, 338, 339).

There is no work history of any duration in Plaintiff's earnings records. He "needs someone to go with him" if he leaves Ms. Smith's residence. (TR 340). Ms. Smith provided his meals and a small amount of money ($10) with which he could buy personal items. He had no driver's license and had never had one. (TR 77). He testified that he was unable to pass the aptitude test for employment at McDonald's and failed to qualify for a license as a brick mason because he was too "slow." (TR 81-82). He had to be told to wash his clothes and clean up after himself. (TR 338). On one occasion when Ms. Smith helped him get a job in construction, he was let go after one day because he was too slow and could not comprehend instructions. (TR 101). An agency administrator noted that during a face-to-face interview with Plaintiff he "had difficulty answering some of the questions and did not know how to write the date on the [form.]" (TR 304). He also had "body odor as if he had not had a shower in a few days" and "smell[ed] like alcohol as well." (TR 304).

The ALJ's findings regarding the severity of Plaintiff's functional limitations fail to acknowledge the sheltered nature of his environment and his dependence upon his caretaker to meet all of his basic needs. Concerning the assessment of the severity of functional

limitations in performing activities of daily living, the agency's regulations provide that

> "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
> . We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1).

There is nothing in the record indicating that Plaintiff was capable of performing daily living activities independently, appropriately, or effectively or that he could sustain such activities. Employing the agency's own regulations as to the definition of a "marked" impairment in this functional area, Plaintiff had a "marked" impairment, and no reasonable factfinder would find otherwise.

Concerning the assessment of the severity of a mental impairment in terms of the claimant's functional ability to concentrate, persist, or perform tasks at an appropriate pace, the regulations provide:

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit

> the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.
> * * *
> We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.
> We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function ... [I]f you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3).

The ALJ's finding that Plaintiff had only a "mild" limitation in the area of concentration, persistence, or pace finds no support in the record. The ALJ stated that Plaintiff had described "daily activities including meal preparation and shopping in stores" and the ability to "read[ ] and understand[ ] English and . . . write more than his name in English." (TR 24). This finding, again, fails to acknowledge the evidence in the record showing Plaintiff lived in a sheltered environment in which he is dependent on other people

11

and requires constant supervision and direction.

Plaintiff stated that "my friend I live with help[s] me shop for food." (TR 298). This is hardly evidence of an independent ability to shop in stores. Plaintiff testified he had a fourth grade reading level, and Ms. Smith testified that he was unable to concentrate or remember instructions. Plaintiff and Ms. Smith testified he could make a sandwich but could not prepare a meal. (TR 297).

The agency has provided guidance regarding this critical functional limitation: "Information concerning [a claimant's] behavior during any attempt to work and the circumstances surrounding termination of [the claimant's] work effort are particularly useful in determining your ability or inability to function in a work setting. In addition, [the agency] should also examine the degree to which [the claimant] require[s] special supports (such as those provided through supported employment or transitional employment programs) in order to work." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(3). The ALJ's cursory and mistaken statements concerning this critical functional limitation are not supported by substantial evidence in the record.[4]

Moreover, the ALJ found that Plaintiff was an individual of "younger age" and failed

---

[4] On remand, should the ALJ find that Plaintiff's mental impairments are disabling, the ALJ would then be required to assess the Plaintiff's substance addiction disorder under 42 U.S.C. §§423(d)(2)(C), 1382c(a)(3)(J).("An individual shall not be considered to be disabled .... if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."); 20 C.F.R. § 416.935(a)(when an ALJ determines a claimant is disabled but there is medical evidence in the record of drug addiction or alcoholism, the ALJ must determine whether that substance abuse is a "contributing factor material to the determination of disability.").

to recognize that during the pendency of the administrative proceeding Plaintiff turned 50 years old, and his age changed to the classification of "approaching advanced age." See 20 C.F.R. § 220.128(c)("If the claimant is closely approaching advanced age (50–54), the Board considers that the claimant's age, along with a severe impairment and limited work experience, may seriously affect the claimant's ability to adjust to a significant number of jobs in the national economy."). Plaintiff was 52 years old at the time of the ALJ's decision. (TR 303). The ALJ's failure to consider this age advancement and its ramifications on Plaintiff's application was error.

RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner and REMANDING the case for further administrative proceedings. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before October 5th, 2015, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed

13

herein is denied.

ENTERED this _____15th_____ day of _____September_____, 2015.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE